Case No. 25-30560

UNITED STATES COURT OF APPEALS, FIFTH CIRCUIT

---

In re: In the Matter of the Complaint of Whitney Oil & Gas L.L.C.

---

Quality Process Services, L.L.C.

Third Party Defendant – Appellant

v.

Whitney Oil and Gas, L.L.C., as Owner of the Field Boat M/V Lil Red for Exoneration from and/or Limitation of Liability

Plaintiff – Appellee

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA, No. 2:22-CV-3015,
UNITED STATES DISTRICT JUDGE JANE TRICHE MILAZZO

---

ORIGINAL BRIEF FOR THIRD PARTY DEFENDANT–APPELLANT

---

DAIGLE, FISSE & KESSENICH, PLC
MICHAEL W. McMAHON (La. Bar. No. 23987)
KIRK N. AURANDT (La. Bar No. 25336)
P.O. Box 5350
Covington, Louisiana 70434-5350
Telephone: (985) 871-0800
Facsimile: (985) 871-0899
Attorneys for Third Party Defendant–Appellant,
Quality Process Services, L.L.C.

# Certificate of Interested Persons

No. 25-30560

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1. Quality Process Services, L.L.C. (no parent corporation or publicly held corporation owns 10% or more of its stock): Third Party Defendant–Appellant;

2. Kyle Domangue and Greg Baudoin: members of Quality Process Services, L.L.C.;

3. Clear Spring Property & Casualty Company and Talisman Marine Insurance Company, Inc.: primary underwriters of Quality Process Services, L.L.C. (not parties in the case);

4. Whitney Oil & Gas, L.L.C. (wholly owned by Trimont Energy LTD, a privately-held Delaware corporation; no publicly-traded corporation owns any of its stock): Plaintiff-Appellee;

5. Starstone National Insurance Company: MEL/Longshore carrier for Whitney Oil & Gas, L.L.C. (not a party in the case);

6. Markel International Insurance Company Limited: CGL carrier for Whitney Oil & Gas, L.L.C. (not a party in the case);

7. Certain Underwriters at Lloyd's London Subscribing to Umbrella Policy No. USRUMB203000: excess underwriter for Quality Process Services, L.L.C. (not a party in the case);

8. Michael W. McMahon, Esq. and Kirk N. Aurandt, Esq. of Daigle, Fisse & Kessenich, PLC, Madisonville, LA: Attorneys for Third Party Defendant–Appellant, Quality Process Services, L.L.C.;

9. Robert R. Johnston, Esq., Courtney E. Crowell, Esq., and Constance C. Waguespack, Esq. of Pusateri, Johnston, Guillot & Greenbaum, LLC; New Orleans, LA: Attorneys for Plaintiff–Appellee, Whitney Oil & Gas, L.L.C.;

10. Henry H. LeBas, Esq., and Todd A. Delcambre, Esq. of LeBas Law Offices, Lafayette, LA: Attorneys for Whitney Oil & Gas, L.L.C.;

11. Anthony J. Staines, Esq. of Staines, Eppling & Kenney, LLC, Metairie, LA; Attorney for Certain Underwriters at Lloyd's London Subscribing to Umbrella Policy No. USRUMB203000; and

12. Thomas M. Flanagan, Esq. and Anders F. Holmgren, Esq. of Flanagan Partners LLP, New Orleans, LA: Attorneys for Plaintiff-Appellee, Whitney Oil & Gas, L.L.C.

/s/ Kirk N. Aurandt
MICHAEL W. McMAHON
KIRK N. AURANDT
Attorneys for Third Party Defendant–
Appellant, Quality Process Services, L.L.C.
Date: February 20, 2026

## Statement Regarding Oral Argument

Given the novel questions of admiralty or maritime law regarding an exception to this Court's test for maritime contract status in the offshore oil and gas industry presented by this appeal, Third Party Defendant–Appellant, Quality Process Services, L.L.C., respectfully desires oral argument.

# Table of Contents

**Page**

Certificate of Interested Persons ....... i

Statement Regarding Oral Argument ....... iii

Table of Contents ....... iv

Table of Authorities ....... vii

Statement of Jurisdiction ....... 1

Statement of Issues Presented for Review ....... 4

Statement of the Case ....... 6

A. Introduction ....... 6

B. Basic Facts ....... 7

C. The Master Service Agreement Between Whitney and QPS ....... 9

D. Work Orders ....... 15

E. Day of Incident ....... 16

F. Hurricane Ida and Aftermath ....... 18

G. Bench Trial ....... 18

H. The District Court's Decision, Post-Trial Proceedings and Appeal ... 19

Summary of Argument ....... 22

Standard of Review ....... 25

Argument ....... 25

Introduction ........................................ 25

1. General overview of this Court's two-part test for determining maritime contract status in the oil and gas industry ........................................ 26

   A. It is undisputed that part one of the two-part test for maritime contract status is satisfied ........................................ 28

   B. Part two of the two-part test for maritime contract status focuses on the parties' expectations as to whether a vessel will play a substantial role in completing the contract ........................................ 28

2. This Court's precedent establishes that both the MSA and the particular work order under which QPS was performing its work at the time of the incident should be considered in determining the nature of the contractual relationship between the parties ........................................ 30

   A. The MSA contemplates vessel involvement in the performance of QPS' work ........................................ 33

   B. The verbal orders Whitney provided to QPS' production operators were given with the understanding that a vessel would be required ........................................ 36

3. The evidence presented at trial overwhelmingly demonstrates that the second part of this Court's two-part test for maritime contract status in the oil and gas industry was satisfied and that the contractual relationship between QPS and Whitney was maritime in nature ........................................ 38

   A. An exception to this Court's general rule that the use of a vessel in transporting workers to and from a jobsite is not considered in the calculus involved in determining maritime contract status is respectfully warranted when, as here, the production operators provided by QPS were actually operating Whitney's vessels in driving to, from, and between offshore jobsites, and were not mere passengers in a vessel being operated by a third party ........................................ 39

B. There is an abundance of evidence demonstrating the parties' mutual expectations of substantial vessel use and involvement ....... 42

4. The district court erred in granting Whitney's post-trial contractual claim to recover its attorney fees from QPS because the claim is prohibited by the Louisiana Oilfield Anti-Indemnity Act considering that Whitney's pre-trial settlement with Mr. Espadron precluded a judicial determination as to whether Whitney bore any fault for Mr. Espadron's injuries ....... 47

Conclusion ....... 52

Certificate of Service ....... 53

Certificate of Compliance ....... 54

# Table of Authorities

**Cases** **Page**

Barrios v. Centaur, L.L.C., 942 F.3d 670 (5th Cir. 2019), cert. denied, 509 U.S. 906, 140 S.Ct. 2675, 206 L.Ed.2d 826 (2020)........................25, 27, 32, 33

Bass v. Phoenix Seadrill/78 Ltd., 749 F.2d 1154 (5th Cir.1985) ............................49

British Transport Commission v. United States, 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234 (1957)..................................................................50

Earnest v. Palfinger Marine U.S.A., Inc., 90 F.4th 804 (5th Cir. 2024), cert. denied sub nom., Shell Offshore Inc. v. Palfinger Marine USA, Inc., 145 S.Ct. 155, 220 L.Ed.2d 21 (2024)............................................27, 29, 30, 41, 44

Genesis Energy, L.P. v. Danos, L.L.C., 152 F.4th 648 (5th Cir. 2025)......... 19, 27-29

In re Aries Marine Corp., No. 25-30010, ___ F.4th ___, 2026 WL 350683 (5th Cir. Feb. 9, 2026).........................................................................27, 29

In re Crescent Energy Services, L.L.C., 896 F.3d 350 (5th Cir. 2018), cert. denied sub nom., Liberty Mut. Ins. Co. v. Carrizo Oil & Gas, Inc., 586 U.S. 1060, 139 S.Ct. 642, 202 L.Ed.2d 505 (2018).................................. 27-32

In re Larry Doiron, Inc., 879 F.3d 568 (5th Cir. 2018) (en banc), cert. denied, 584 U.S. 994, 138 S.Ct. 2033, 201 L.Ed.2d 280 (2018)............ 4, 20, 22, 26-31, 36, 39-41, 46

In re Offshore Oil Services, Inc., 150 F.4th 677 (5th Cir. 2025)...........19, 26, 27, 40, 41, 43

Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), reh'g denied, 366 U.S. 941, 81 S.Ct. 1657, 6 L.Ed.2d 854 (1961) ..........................................................................26

Luwisch v. American Marine Corp., 956 F.3d 320 (5th Cir. 2020) .........................25

Melancon v. Amoco Production Co., 834 F.2d 1238 (5th Cir. 1988), amended in part on reh'g, 841 F.2d 572 (5th Cir. 1988) ........................................49

Meloy v. Conoco, Inc., 817 F.2d 275 (5th Cir. 1987) ............................................48

Meloy v. Conoco, Inc., 504 So.2d 833 (La. 1987) .................................................48

Miller v. Republic National Life Ins. Co., 559 F.2d 426 (5th Cir.1977), reh'g denied, 564 F.2d 97 (5th Cir. 1977) ................................................................49

Mitchell v. Goings, 37 F.4th 169 (5th Cir. 2022) .......................................................3

Tanksley v. Gulf Oil Corp., 848 F.2d 515 (5th Cir. 1988) ..........5, 21, 24, 47, 48, 51

**Statutes, Rules, and Other Authorities**

U.S. Const. art. III, § 2 .........................................................................................1

28 U.S.C. §1291 ........................................................................................................3

28 U.S.C. §1333 ........................................................................................................1

Shipowners Limitation of Liability Act, 46 U.S.C. § 183, et seq...........................34

Jones Act ..................................................................................................................45

Louisiana Oilfield Anti-Indemnity Act, La. R.S. 9:2780 ..................5, 6, 20, 21, 24, 47-49, 51

Federal Rule of Civil Procedure 54(d)(2) ...............................................................21

Fed. R. App. P. 32(a)(5)...........................................................................................54

Fed. R. App. P. 32(a)(6)...........................................................................................54

Fed. R. App. P. 32(a)(7)(B)(i)...................................................................................54

Fed. R. App. P. 32(f).................................................................................................54

5th Cir. R. 28.2.1 .................................................................................................i

5th Cir. R. 32.1 ...............................................................................................54

5th Cir. R. 32.2 ...............................................................................................54

## Statement of Jurisdiction

Plaintiff-Appellee, Whitney Oil and Gas, L.L.C. ("Whitney"), filed a Verified Complaint in the district court seeking exoneration from or limitation of liability for claims stemming from a vessel allision on navigable waters (the "Limitation Action"). ROA.16-46. The district court exercised subject matter jurisdiction under 28 U.S.C. §1333 and Article III, Section 2 of the United States Constitution. ROA.1240. Claimant, Kerri Espadron—a Whitney employee who was aboard the vessel and suffered personal injuries in the allision—filed an Answer, Claim in Limitation and Third-Party Complaint in the Limitation Action wherein he sought to recover damages against Whitney for his injuries, contested Whitney's right to limit its liability, and further sought to recover damages against Third Party Defendant-Appellant, Quality Process Services, L.L.C. ("QPS"), whose employee, Wyatt Boone, was operating the Whitney vessel at the time of the allision. ROA.52-66. QPS filed an Answer and Claim in the Limitation Action contesting Whitney's right to limit its liability and seeking contractual defense and indemnity from Whitney for Mr. Espadron's Third-Party Complaint under a Master Service Agreement ("MSA") between Whitney and QPS. ROA.68-80. Additionally, QPS filed an Answer to Mr. Espadron's Third-Party Complaint wherein it denied liability. ROA. 83-92. Whitney and QPS jointly settled Mr. Espadron's personal injury

claims prior to trial, leaving only QPS' claims against Whitney for contractual defense and indemnity to be tried by the district court. ROA.1054.

Following an August 13, 2025 bench trial on QPS' claim against Whitney for contractual defense and indemnity, ROA.1062-1063; the district court, on September 22, 2025, entered Findings of Fact and Conclusions of Law in favor of Whitney, ROA.1235-1246; held that the MSA between Whitney and QPS was non-maritime in nature and governed by Louisiana law, ROA.1245; and further held that QPS' claim for contractual defense and indemnity was therefore barred by the Louisiana Oilfield Anti-Indemnity Act, ROA.1246. The next day, the district court entered a Judgment that dismissed all of QPS' claims against Whitney with prejudice. ROA.1247.

On September 26, 2025, QPS timely filed a Notice of Appeal, ROA.1248; from both the Findings of Fact and Conclusions of Law, ROA.1235-1246; and the Judgment dismissing all of QPS' claims against Whitney with prejudice, ROA.1247. On October 7, 2025, Whitney, claiming entitlement under the MSA, filed a Motion for Taxation of Costs, Attorney Fees and to Alter or Amend Judgment, ROA.1253-1257; which QPS opposed, ROA.1258-1265. On October 29, 2025, the district court entered its Order and Reasons granting Whitney's Motion for Taxation of Costs, Attorney Fees and to Alter or Amend Judgment, but deferring ruling on the amount of attorney's fees to be awarded to Whitney until after the resolution of this appeal.

ROA.1272-1278. Later that same day, QPS filed an Amended Notice of Appeal, ROA.1279; to now include the Findings of Fact and Conclusions of Law, ROA.1235-1246; the Judgment dismissing QPS' claims against Whitney with prejudice, ROA.1247; and the Order and Reasons granting Whitney's post-trial motion to recover its costs and attorney's fees, ROA.1272-1278. This Court has appellate jurisdiction over this matter under 28 U.S.C. §1291. See Mitchell v. Goings, 37 F.4th 169, 172 (5th Cir. 2022) ("We exercise jurisdiction over this appeal because the dismissal of an action—whether with or without prejudice—is final and appealable.") (citation and quotation marks omitted).

## Statement of Issues Presented for Review

1. Whether the contractual relationship between Whitney and QPS was maritime in nature such that the obligations of the parties are governed by federal maritime law and not Louisiana law when both parties expected that the offshore production operators that QPS contractually provided to Whitney would routinely operate Whitney's vessels in the performance of their duties, that the vessels were necessary for the production operators to be able to perform their duties offshore, and that the vessels were necessary for Whitney to be able to operate its offshore oil fields.

2. Whether an exception to this Court's general rule that the calculus involved in determining whether a vessel played a substantial role in the completion of the contract does not include vessel transportation to and from a jobsite, see In re Larry Doiron, Inc., 879 F.3d 568, 576 n.47 (5th Cir. 2018) (en banc), cert. denied, 584 U.S. 994, 138 S.Ct. 2033, 201 L.Ed.2d 280 (2018), is warranted when the contracted for worker is not merely a passenger on the vessel but instead is actually driving the vessel to, from, and between different offshore job sites numerous times each day in the performance of his duties as a production operator.

3. Whether, if the district court's determination that the contractual relationship between QPS and Whitney was non-maritime and the resultant dismissal of QPS' contractual claims against Whitney is affirmed, Whitney's post-trial motion to recover its attorney's fees and costs from QPS under the Master Service Agreement

between Whitney and QPS is nevertheless prohibited by the Louisiana Oilfield Anti-Indemnity Act, La. R.S. 9:2780, because Whitney's pre-trial settlement of Mr. Espadron's personal injury claims foreclosed a judicial determination that Whitney was free from fault.[1] See Tanksley v. Gulf Oil Corp., 848 F.2d 515, 517–18 (5th Cir. 1988).

---

[1] This issue will be moot if the district court's decision regarding non-maritime contract status is reversed.

## Statement of the Case

### A. Introduction

On September 27, 2021, Claimant, Kerri Espadron ("Mr. Espadron")—a production operator employed by Plaintiff-Appellee, Whitney Oil & Gas, L.L.C. ("Whitney"), but who is not a party to this appeal—was injured when a Whitney vessel (the Lil Red) being driven by Wyatt Boone—a contract production operator employed by Third-Party Defendant-Appellant, Quality Process Services, L.L.C. ("QPS") and provided to Whitney—allided with a well jacket on navigable waters off of the Louisiana coast. ROA.1235-1236. On August 13, 2025, the Honorable Jane Triche Milazzo, United States District Judge, presided over a one-day bench trial in the district court. ROA.1062-1063. QPS appeals from the district court's determination that the 2016 Master Service Agreement (the "MSA") between Whitney and QPS was a non-maritime contract such that QPS' claim against Whitney for contractual defense and indemnity from Mr. Espadron's personal injury claim was governed by Louisiana law and barred by the Louisiana Oilfield Anti-Indemnity Act. ROA.1235-1246, 1279. QPS also appeals from the district court's post-trial determination that the MSA permitted Whitney to recover its costs and attorney's fees expended in defending against QPS' claim for contractual defense and indemnity. ROA.1272-1279.

## B. **Basic Facts**

Whitney is an oil and gas exploration and production company that operates certain oil fields in federal and state waters off Louisiana including the East Bay Field. ROA.1236. QPS is an oil field service company that provides contract labor, including production operators, mechanics, compressor pump operators, tank battery operators, and cooks to Whitney and other oil and gas producing companies. ROA.1236-1237, 1471:19-23, 1486:21-1487:9, 1517. QPS provided these contract workers to Whitney under the MSA between those parties. ROA.1237, 1516:23-1518:1. More than half of the workers that QPS provided to Whitney were production operators. ROA.1237.

Whitney's operations are run out of a central facility located on an island near East Bay, which is situated on the mouth of the Mississippi River and the Gulf of Mexico. ROA.1437:18-21. All of the oil in Whitney's entire field comes into the central facility where it is then sold through a pipeline. ROA.1438:1-3. Whitney's central facility has living quarters, a boat shop, a warehouse, and a tank battery. ROA.1437:24-1438:1. Workers initially accessed the central facility via a small crew boat departing from Venice, Louisiana, at the beginning of their shifts. ROA.1437:15-18. The production operators provided by QPS primarily worked out in the field. ROA.1332:10-12, 1487:10-12. The daily use of vessels is necessary for Whitney to conduct its business in East Bay, and Whitney cannot run its

operations or run the East Bay Field without vessels being used day in and day out. ROA.1418:12-17, 2069:3-6. Thus, the driving of a vessel was a necessary part of a production operators' job. ROA.1295:19-1296:9, 1301:12-14, 1404:7-9.

A production operator works a twelve- hour shift each day during his fourteen-day hitch and is responsible for supervising the production platform, monitoring well pressures, and maintaining equipment, flow, and all aspects of downstream production. ROA.1401:2-8, 1404:23-24, 1970. A production operator is also responsible for maintaining the surrounding satellite wells that flow into a particular platform. ROA.1287:3-20, 1288:2-10, 1399:16-22. To perform these duties, a production operator, among other things, travels via boat to every platform and surrounding satellite well on a daily basis to address any issues, check risers, check gratings, check gauges, change out valves, change out chokes, assess and repair navigation lights on wells and platforms, transfer chemicals to a satellite or platform from a 500-gallon container, and conduct pollution checks. ROA.1289:9-18, 1300, 1346:2-11, 1370:24-1371:12. With respect to pollution checks, they can only be done from a boat, ROA.1414:19-21; a production operator was expected to check for oil sheens every time he was on a boat, ROA.1290:10-17; and a pollution check of the field could not be done from the central facility. ROA.1290:10-17, 1449:16-1450:3. These routine production operator duties involve the regular use of a vessel. ROA.1289:21-1290:1, 1301:12-14. Thus, the production operators provided by

QPS operated Whitney's vessels day in and day out to perform their work out in the field. ROA.1416:20-23. In other words, the driving of a vessel was a necessary part of a production operator's job. ROA.1295:22-1296:4. This regular operation of Whitney's vessels by the production operators provided by QPS was anticipated and expected by both Whitney and QPS. ROA.1389:19-1390:17, 1415:20-1417:10, 1449:6-15, 1474:5-7, 1476:12-16, 1504:15-22. QPS does not own any vessels. ROA.1518:2-4. Whitney owns several vessels including the Big Al and the Lil Red. ROA.1236, 1338:16-19.

Kerri Espadron was a production operator for Whitney who was assigned to Whitney's East Bay Field. ROA.1236. Mr. Espadron has worked at Whitney's facility for Whitney and other companies for nearly twenty years. ROA.1286:21-24. Before coming to work for Whitney in 2019, Mr. Espadron was a production operator for QPS in this same field for over three years. ROA.1286:25-1287:11, 1319:12-15. Wyatt Boone was employed by QPS as a production operator and was provided to Whitney as a contract worker under the MSA to also work in Whitney's East Bay Field. ROA.1236.

## C. <u>The Master Service Agreement Between Whitney and QPS</u>

On January 6, 2016, Whitney and QPS entered into a Master Service Agreement ("MSA"), ROA.1236; the purpose of which was "to set forth the terms and conditions of any Work undertaken by Contractor [QPS] for Company

[Whitney], and to define the contractual rights, obligations, and liabilities of the Parties," ROA.1588. In this respect, the MSA states:

> Article 2
> The Agreement
>
> 2.1 *Agreement*. The following documents shall be deemed to form, and be read and construed as part of this Agreement:
>
> EXHIBIT A– Work Order Sample
>
> EXHIBIT B– Terms, Conditions, and Minimum Limits of Insurance Coverage Required of Contractor [QPS]
>
> EXHIBIT C– Insurance Questionnaire
>
> 2.2 Purpose. The purpose of this Agreement is to set forth the terms and conditions of any Work undertaken by Contractor [QPS] for Company [Whitney], and to define the contractual rights, obligations, and liabilities of the Parties. This Agreement shall not establish exclusivity of business dealings between the Parties nor shall Company [Whitney] be committed to contract for a stated volume of Work during the Term. This Agreement shall govern all Work performed by Contractor [QPS] under any Work Order, and any agreement or stipulations in any Work Order used by either Party not in conformity with the provisions hereof shall be null and void.

ROA.1588. The MSA defines "Work" to mean "the work, jobs, services, goods, deliverables, duties and activities to be performed or provided by, or on behalf of, Contractor [QPS] under this Agreement, including all necessary ancillary equipment, personnel and tools of trade to effect such work, jobs, services, goods, deliverables, duties and activities, as specified in accordance with the provisions of the Work Order." ROA.1588. The MSA defines the term "Work Order" to mean

"an order for Work issued by Company [Whitney] to Contractor [QPS], as more fully described in Article 2." ROA.1588. Article 3 of the MSA further describes the "Work" and "Work Order" in the following manner:

> 3.1 *Work Order*. During the Term, Company [Whitney] may request Contractor [QPS] to perform Work by issuing a Work Order to Contractor [QPS]. Each Work Order, after its execution by Company [Whitney] and Contractor [QPS], shall be considered an individual Work Order and Exhibit to this Agreement, subject to the same terms and conditions set forth herein. The terms and conditions of this Agreement can be amended by and within a Work Order, for that individual Work Order only, provided that any such amendment to the terms and conditions of this Agreement are expressly identified as an amendment to this Agreement and are executed by a duly authorized Representative of each Party. …
>
> 3.2 *Performance of Work*. **<u>Following the agreement of the Parties to a Work Order</u>**, Contractor [QPS] shall furnish, mobilize, operate, and manage the Contractor Furnished Items, Contractor's Personnel, Subcontractors or equipment described therein at the time and place agreed upon, and continue operations diligently and without delay in a safe, proper, and workmanlike manner, in strict conformity with the specifications and requirements herein and in the applicable Work Order….
>
> * * *
>
> 3.4 *Communications*. All Work Orders, instructions, communications, authorizations, approvals, acknowledgments, and acceptances ("*Communications*") expressly referenced within this Agreement shall be in writing. Notwithstanding the requirements of the foregoing, any Communication that is issued orally shall be binding upon the Parties and managed in accordance with the terms and conditions of this Agreement; provided that such oral Communication is confirmed in writing within a reasonable and timely manner, not to exceed seventy-two (72) hours.

> 3.5 *Exclusivity*. Company [Whitney] is hiring Contractor [QPS] on a non-exclusive basis. Company [Whitney] may retain other persons and use its own employees to perform any of the Work as Company [Whitney] in its sole discretion deems appropriate. **Company [Whitney] is not obligated by this Agreement to order any stated amount of Work from Contractor [QPS]**.

ROA.1589; (emphasis added). In addition, Whitney reserved the sole right to terminate any Work Order or part of a Work Order. ROA.1599. The MSA specifically contemplates that Whitney would request that QPS perform "Work" by issuing some type of "Work Order." ROA.1589. The MSA is not self-executing and does not authorize QPS to do "Work" for Whitney unless Whitney specifically requests that QPS perform "Work." ROA.1589, 1599.

The MSA also contains defense, indemnity, and hold harmless provisions that run in favor of QPS and state that Whitney is financially responsible for injuries to Whitney's employees regardless of the fault of QPS:

Article 5

INDEMNITIES AND LIABILITIES

* * *

> 5.2 *Indemnity from Company [Whitney] to Contractor [QPS]. Company [Whitney] hereby releases and shall protect, defend, release, indemnify, and hold harmless contractor group from and against any and all claims, damages, and expenses suffered with respect to:*
>
> (i) personal, emotional, physical, and psychological injury (including illness, disease, bodily injury or death) of company group;

> (ii) loss, damage, or destruction of property owned or hired by company group; and
>
> (iii) except as provided in and subject to article 5.1(i)-(ii) above, the pollution or contamination of the land, water, air or environmental (including all costs and expenses incurred in control or removal (or in connection with any action required by a governmental authority) that arise or result from spills, leaks, discharges or releases of fuels, lubricants, motor oils, pipe dope, paints, coatings, solvents, bilge, garbage or hazardous materials) emanating from company group's property or equipment;
>
> Arising out of this agreement, any bridging agreement, any performance or non-performance work or any presence on any premises (or mode of transportation) in connection therewith, without limitation and regardless of the actual or alleged cause, fault or responsibility, contractual, statutory or otherwise (including sole, joint, or concurrent negligence, fault or strict liability) of anyone, including contractor group, or any unseaworthiness of any vessel or unairworthiness of any aircraft, but not for claims to the extent arising from contractor group's gross negligence or willful misconduct.

ROA.1594-1595. Under the MSA, the term "Company Group" "means and includes (both individually and collectively) Company [Whitney], its Affiliates, its and their co-participants, partners, co-lessees, co-owners, joint venturers, and contractors and subcontractors, and its and their respective directors, officers, employees (including agency personnel), servants, agents and invitees, but does not include any member of Contractor Group." ROA.1586. The MSA defines the term "Contractor Group" to "mean[] and include[] (both individually and collectively) Contractor [QPS], Contractor's [QPS'] Personnel, its Affiliates, Subcontractors, and its and their co-participants, co-lessees, co-owners, joint venturers, and its and their respective

directors, officers, employees (including agency personnel), servants, agents, and invitees, but does not include any member of Company Group." ROA.1586. Mr. Espadron, as an employee of Whitney, is a member of "Company Group" for purposes of the MSA. ROA.1586.

Article 9 of the MSA states that "the General Maritime Law of the United States of America shall govern the interpretation of this Agreement and the relationship of the Parties to the exclusion of other law." ROA.1601. With respect to insurance coverage, the MSA states that "[a]ll policies required to be carried by Contractor [QPS] shall have adequate territorial and navigational limits for the location of the Work, including, where appropriate, operations in the Gulf of Mexico." ROA.1605. The MSA's insurance requirements further state that "[i]f Contractor [QPS] uses, or hires, or charters vessels, or employs maritime workers and/or Jones Act Seamen and/or persons who work on or over navigable waters (including Outer Continental Shelf), Contractor [QPS] must obtain (in addition to any other coverage that is required of Contractor [QPS]) all applicable maritime coverage set forth below that is designated by the symbol "*"." ROA.1605. Additionally, the MSA's insurance requirements state that "[w]here the Work involves the use of Vessels or marine equipment, the Contractor [QPS] shall provide the following insurance[:]

> I. Protection and Indemnity per SP-23 or the equivalent or watercraft exclusion deleted in a General Liability policy including the following coverages (a) – (m).

ROA.1607-1608. The MSA's Insurance Coverage Requirements also mandate that QPS obtain hull and machinery coverage when a vessel is to be used. ROA.1608. Finally, the MSA requires that QPS obtain Charterer's Legal Liability Insurance. ROA.1609.

**D. <u>Work Orders</u>**

It has never been a common practice for Whitney to issue a written work order to QPS, and Whitney is not aware of any written work orders ever being issued to QPS. ROA.2018:14-25, 2113:11-19. The specific work instructions that the QPS production operators received each day from Whitney were in the form of verbal directions or orders from the Whitney Person in Charge, and it was understood that a vessel would be required. ROA.1478:8-19, 1480:23-1481:1, 2162:12-22. These verbal orders were not reduced to writing. ROA.1485:8-15. QPS, however, would send written invoices to Whitney every two weeks for the work its employees performed for Whitney. ROA.1520:2-4. Whitney would provide the job classification designations shown on the individual time sheets for each person that would accompany each invoice and Whitney's production foreman would also sign and approve the time sheet. ROA.1522:1-14, 1522:17-1523:7, 1648-1969; (invoices introduced at trial). With respect to vessel use, Whitney did not maintain any written

records or documents showing when one of its vessels would be used as a work platform. ROA.2089:6-13. Whitney also does not have any written records or documents that detail how much time a production operator spends aboard a vessel performing work versus the time spent aboard a platform or on land performing work. ROA.2030:2-6, 2086:10-2088:5, 1418:7-11.

## E. Day of Incident

On the day of the incident, September 27, 2021, following an early morning production meeting at Whitney's central facility between the production operators and the foreman, ROA.1311:15-19; Whitney's Person-in-Charge, Clayton Holmes, issued verbal orders to the various personnel, ROA.1415:20-25, 1435:12-14. Specifically, Clayton Holmes instructed Wyatt Boone and Kerri Espadron to go out in the field and do a pollution check, and Holmes knew that they would need to use a vessel to complete that task. ROA.1416:1-7. Also, Boone and Espadron were instructed to drive out to platform Knockout 3 to have a Job Safety Analysis Sheet signed so that construction work to repair hurricane damage to that platform could begin. ROA.1311:20-1312:11, 1317:2-4, 1349:15-17. Wyatt Boone drove Whitney's vessel Lil Red out into the field, and Kerri Espadron served as lookout. ROA.1312:12-14. On the way out, the Lil Red allided with a well and Kerri Espadron suffered injuries. ROA.1313:3-9. After the incident, Whitney paid maintenance and cure to Kerri Espadron. ROA.17; ("Whitney has been paying and

continues to pay maintenance and cure to or on behalf of Kerri Espadron."). At the time of the incident, Wyatt Boone had been operating Whitney's vessels under the supervision of Clayton Holmes for about two years. ROA.1416:16-19. Kerri Espadron had ridden in a boat with Wyatt Boone hundreds of times before the incident. ROA.1307:25-1308:2. It was considered normal operating business for QPS personnel, including Wyatt Boone, to operate Whitney's vessels day in and day out in performing their work, and it was recognized by Whitney that a production operator could not do their jobs without the use of Whitney's vessels. ROA.1392:14-20, 1416:16-23.

Because Whitney anticipated that QPS' production operators such as Wyatt Boone would be operating and driving Whitney's vessels throughout the field in order to perform their work, QPS' production operators were required to have completed a boater safety course. ROA.1390:5-15. QPS understood that its obligations under the MSA were to supply personnel and contract operators with the knowledge that the production operators would be operating vessels. ROA.1475:6-9, 1479:16-1480:5. Whitney also understood that QPS' production operators would be operating Whitney's vessels. ROA.1390:5-15, 2074:12-19. This mutual understanding that QPS' personnel would be operating Whitney's vessels in the performance of their work was also referenced in an e-mail exchange between Greg Baudoin of QPS and Jonathan Wiens of Whitney. ROA.1479:2-8, 2004-2006.

**F. <u>Hurricane Ida and Aftermath</u>**

Hurricane Ida struck on August 29, 2021, approximately one month before the incident on September 27, 2021. Hurricane Ida caused Whitney's East Bay Field to be shut in. ROA.1309:2-19. As a result, the scope of work for the production operators changed. ROA.1393:8-10, 1434:25-1435:2. From the time of Hurricane Ida's landfall to the day of the incident, the sole job of the production operators was to check for pollution. ROA.1396:3-6, 1414:14-18. This involved driving around the area in a boat, checking every platform and well, assessing storm damage, and clearing the platforms and wells of storm debris if necessary. ROA.1309:14-19, 1310:3-14. Once this daily offshore assessment was completed, the production operators would assist in cleaning up the central facility if needed. ROA.1349:18-1350:1. Following Hurricane Ida, the production operators would make two separate and independent pollution runs in the Whitney vessel each day—one in the morning, and one in the evening at the end of the day. ROA.1355:16-1356:6. It would take approximately two hours to complete a single run. ROA.1356:7-20.

**G. <u>Bench Trial</u>**

Prior to the case being tried, the parties separately submitted Proposed Findings of Fact and Conclusions of Law to the district court. ROA.946-966, 1022-1041. Also, Mr. Espadron's personal injury claim was settled. ROA.1235. A bench trial was held on August 13, 2025, and the case was taken under advisement.

ROA.1062-1064. During the time that the district court had the case under advisement, this Court handed down two published opinions on the issue of maritime contract status in the oil and gas industry. See In re Offshore Oil Services, Inc., 150 F.4th 677 (5th Cir. 2025); Genesis Energy, L.P. v. Danos, L.L.C., 152 F.4th 648 (5th Cir. 2025). Both Whitney and QPS provided supplemental briefing to the district court regarding these decisions and their possible impact on the case at bar. ROA.1093-1115, 1139-1142, 1168-1189, 1214-1234.

**H. The District Court's Decision, Post-Trial Proceedings, and Appeal**

The district court issued its Findings of Fact and Conclusions of Law on September 22, 2025. ROA.1235-1246. The district court found that QPS' production operators often operated Whitney's vessels as part of their job duties, ROA.1238; and that both QPS and Whitney anticipated that QPS' production operators would be operating Whitney's vessels in furtherance of their work, ROA.1237. The district court also found that "[t]he responsibilities of the QPS production operators were not traditional maritime work," ROA.1239; that QPS' production operators working in Whitney's oil fields normally spent between 15 and 20 percent of their time aboard vessels, ROA.1239; and that QPS and Whitney "did not have a shared expectation that vessels would play a substantial role in the completion of [QPS'] work under the MSA other than for transportation to Whitney Oil's central facility and satellite platforms and wells," ROA.1237-1238, 1244.

Applying this Court's two-part test for maritime contract status stated in In re Larry Doiron, Inc., 879 F.3d 568, 576 (5th Cir. 2018) (en banc), cert. denied, 584 U.S. 994, 138 S.Ct. 2033, 201 L.Ed.2d 280 (2018), and its progeny, the district court found that the second part of the test was not satisfied. ROA.1244. According to the district court, QPS' use of vessels was "primarily for transportation," ROA.1244; and that "other uses [of the vessel]—such as for temporary work platforms or pollution checks when the facility was shut-in—were atypical and incidental to the work contemplated by the agreement," ROA.1244. Thus, the district court found that the MSA was a non-maritime contract governed by Louisiana law, and that the Louisiana Oilfield Anti-Indemnity Act ("LOAIA") invalidated the MSA's defense, indemnity, and insurance provisions, that ran in favor of QPS. ROA.1245-1246. Accordingly, the district court dismissed QPS' claims against Whitney with prejudice. ROA.1246. This appeal followed. ROA.1248.

On October 7, 2025, after QPS had filed its Notice of Appeal, Whitney, claiming entitlement under a provision of the MSA that stated "[i]f any action at law … is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to its reasonable attorney's fees, courts costs, and costs of litigation," ROA.1601, filed a Motion for Taxation of Costs, Attorney Fees and to Alter or Amend Judgment, ROA.1253-1257; which QPS opposed, ROA.1258-1265. On October 29, 2025, the district court entered its Order and Reasons granting

Whitney's Motion for Taxation of Costs, Attorney Fees and to Alter or Amend Judgment, but deferred ruling on the amount of attorney's fees to be awarded to Whitney until after the resolution of this appeal. ROA.1272-1278. In its ruling, the district court rejected QPS' argument that this Court's decision in Tanksley v. Gulf Oil Corp., 848 F.2d 515 (5th Cir. 1988), prohibited such "indemnification" from QPS under the LOAIA because Whitney's settlement of Mr. Espadron's claims precluded a judicial determination that Whitney was free from fault. ROA.1274-1275. The district court also rejected QPS' argument that Whitney's motion was procedurally defective because it did not state the amount of attorney's fees sought or a fair estimate thereof as required by Federal Rule of Civil Procedure 54(d)(2). ROA.1275-1276. Later that same day, QPS filed an Amended Notice of Appeal, ROA.1279; to now include the Findings of Fact and Conclusions of Law, ROA.1235-1246; the Judgment dismissing QPS's claims against Whitney with prejudice, ROA.1247; and the Order and Reasons granting Whitney's post-trial motion to recover its costs and attorney's fees, ROA.1272-1278.

## Summary of Argument

The facts of this case justify an exception to this Court's general rule that the transportation of workers to and from an offshore job site is disregarded when determining whether a vessel played a substantial role in the performance of contracted work. An exception is warranted because the production operators that QPS contractually provided to Whitney were involved in operating Whitney's vessels on a daily basis in the course of their regular duties and were not mere passengers on a vessel operated by others.

The question on appeal is whether the contractual relationship between Whitney and QPS was one that was maritime in nature such that the parties' obligations are governed by federal maritime law and not Louisiana law. In In re Larry Doiron, Inc., 879 F.3d 568 (5th Cir. 2018) (en banc), cert. denied, 584 U.S. 994, 138 S.Ct. 2033, 201 L.Ed.2d 280 (2018), this Court established the following two-pronged test for determining whether a contract for services to facilitate the drilling or production of oil and gas on navigable waters is a maritime contract:

> First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters? … Second, if the answer to the above question is "yes," does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract? If so, the contract is maritime in nature.

In re Larry Doiron, Inc., 879 F.3d at 576. Such a contract is deemed to be maritime only if both parts of the test are answered in the affirmative.

Here, it is undisputed that the first part of the test is satisfied. With respect to the second part of the test, this Court has generally found that both the Master Service Agreement ("MSA") and the relevant work order should be examined in construing the nature of the contractual relationship between the parties. The MSA between Whitney and QPS contemplates vessel involvement in the performance of QPS' work because it provides for the application of general maritime law, contains a "personal contract" clause that only has relevance if a vessel is involved, and contains insurance provisions that require QPS to obtain certain marine insurance coverages if QPS uses a vessel in the performance of its work. Turning to the relevant work order, although Whitney has never issued written work orders to QPS, Whitney did issue verbal instructions to QPS' personnel each day, including on the day of the incident, and it was understood that those instructions involved operating Whitney's vessels.

Moreover, the evidence presented at trial established that QPS' operation of Whitney's vessels in performing its work was critical and necessary on a daily basis for Whitney to be able to operate its oil field. The use of a vessel was also necessary for QPS' production operators to be able to perform their duties and assigned tasks in working in Whitney's oil field. Because a vessel was necessary for the QPS production operators to perform their job duties, it is respectfully submitted that a vessel played a substantial role in QPS' performance of the contract. Thus, the

second part of this Court two-part test for maritime contract status is also satisfied. The district court's decision to the contrary should respectfully be reversed.

Finally, under this Court's decision in Tanksley v. Gulf Oil Corp., 848 F.2d 515, 517–18 (5th Cir. 1988), Whitney's post-trial contractual claim against QPS to recover its attorney's fees in defending against QPS' claims is prohibited by the Louisiana Oilfield Anti-Indemnity Act because Whitney's pre-trial settlement of Mr. Espadron's personal injury claims foreclosed a judicial determination that Whitney was free from fault. Consequently, the district court's decision granting Whitney's post-trial motion for attorney's fees must also be reversed.

## Standard of Review

On appeal from a bench trial, the district court's findings of fact are reviewed for clear error, and the district court's legal conclusions are reviewed de novo. See Luwisch v. American Marine Corp., 956 F.3d 320, 326 (5th Cir. 2020). In this respect, "[t]he interpretation of a maritime contract is a question of law." Barrios v. Centaur, L.L.C., 942 F.3d 670, 680 (5th Cir. 2019), cert. denied, 140 S.Ct. 2675 (2020).

## Argument

## Introduction

This case presents the unique circumstance respectfully warranting an exception to this Court's general rule that the transportation of workers to and from an offshore job site is disregarded when determining whether a vessel played a substantial role in the performance of contracted work. As discussed more fully below, this exception is warranted because the production operators that QPS contractually supplied to Whitney were not mere passengers on a vessel being operated by a third party, but rather were actually driving Whitney's vessels to, from, and between offshore wells and platforms in the daily performance of their duties. This driving of Whitney's vessels was mutually expected and anticipated by both Whitney and QPS, and the use of Whitney's vessels by QPS' production operators was not only critically necessary for the production operators to be able to perform

their assigned duties and tasks but was essential for Whitney to be able to operate its offshore oil fields. As such, this case falls squarely into the category of those cases where this Court has found that a contractual relationship in the offshore oil and gas industry was maritime in nature and thus governed by general maritime law.

**1. General overview of this Court's two-part test for determining maritime contract status in the oil and gas industry.**

The primary issue on appeal is whether the contractual relationship between Whitney and QPS was one that was maritime in nature such that the parties' obligations are governed by federal maritime law and not Louisiana law. See In re Offshore Oil Servs., Inc., 150 F.4th 677, 683 (5th Cir. 2025) ("Federal admiralty law applies to 'maritime contracts.'"). As the U.S. Supreme Court has long recognized, "[t]he boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961), reh'g denied, 366 U.S. 941, 81 S.Ct. 1657, 6 L.Ed.2d 852 (1961). Eight years ago, in the case of In re Larry Doiron, Inc., 879 F.3d 568, 569 (5th Cir. 2018) (en banc), cert. denied, 584 U.S. 994, 138 S.Ct. 2033, 201 L.Ed.2d 280 (2018), this Court, sitting en banc, simplified this Circuit's then-prevailing test for determining "whether a contract for performance of specialty services to facilitate the drilling or

production of oil or gas on navigable waters is maritime."[2] In doing so, this Court established the following two-pronged test for determining whether a contract to provide such services to the oil and gas industry is a maritime contract:

> First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters? … Second, if the answer to the above question is "yes," does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract? If so, the contract is maritime in nature.

In re Larry Doiron, Inc., 879 F.3d at 576. As further explained by this Court:

> This test places the focus on the contract and the expectations of the parties. This is the proper approach in a contract case and assists the parties in evaluating their risks, particularly their liability under indemnification clauses in the contract.

In re Larry Doiron, Inc., 879 F.3d at 576. Finally, this Court held that "[a]n affirmative answer to both questions is necessary before the label 'maritime' may be applied to the contract." In re Crescent Energy Services, L.L.C., 896 F.3d 350, 355

[2] This Court's en banc decision in In re Larry Doiron, Inc., 879 F.3d 568 (5th Cir. 2018) (en banc), cert. denied, 584 U.S. 994, 138 S.Ct. 2033, 201 L.Ed.2d 280 (2018), was the first in a developing line of published opinions from this Court that have considered the difficult and fact-intensive question of whether a particular contractual agreement associated with the production of oil and gas resources on navigable waters qualifies as a maritime contract. These published opinions are: In re Crescent Energy Services, L.L.C., 896 F.3d 350, 355 (5th Cir. 2018), cert. denied sub nom.,Liberty Mut. Ins. Co. v. Carrizo Oil & Gas, Inc., 586 U.S. 1060, 139 S.Ct. 642, 202 L.Ed.2d 505 (2018); Barrios v. Centaur, L.L.C., 942 F.3d 670 (5th Cir. 2019), cert. denied, 509 U.S. 906, 140 S.Ct. 2675, 206 L.Ed.2d 826 (2020); Earnest v. Palfinger Marine U.S.A., Inc., 90 F.4th 804 (5th Cir. 2024), cert. denied sub nom., Shell Offshore Inc. v. Palfinger Marine USA, Inc., 145 S.Ct. 155, 220 L.Ed.2d 21 (2024); In re Offshore Oil Services, Inc., 150 F.4th 677 (5th Cir. 2025); Genesis Energy, L.P. v. Danos, L.L.C., 152 F.4th 648 (5th Cir. 2025); In re Aries Marine Corp., No. 25-30010, ___ F.4th ___, 2026 WL 350683 (5th Cir. Feb. 9, 2026).

(5th Cir. 2018), cert. denied sub nom., Liberty Mut. Ins. Co. v. Carrizo Oil & Gas, Inc., 586 U.S. 1060, 139 S.Ct. 642, 202 L.Ed.2d 505 (2018).

**A. It is undisputed that part one of the two-part test for maritime contract status is satisfied.**

Working through the two-pronged test, it is undisputed, and the district court so found, ROA.1242; that part one of the test (whether the contract is one to provide services to facilitate the drilling or production of oil and gas on navigable waters) was satisfied because Whitney is an oil and gas exploration and production company that owns or operates oil fields on navigable waters off of the coast of Louisiana, and the labor services that QPS provided aided in those functions, ROA.2114:12-2115:1. Thus, the answer to the first part of the test is "Yes."

**B. Part two of the two-part test for maritime contract status focuses on the parties' expectations as to whether a vessel will play a substantial role in completing the contract.**

Turning to the second part of the two-pronged test for maritime contract status, the focus is on whether "the contract provide[s] or do the parties expect that a vessel will play a substantial role in the completion of the contract." In re Larry Doiron, Inc., 879 F.3d at 576. In this respect, this Court has opined that a vessel plays a substantial role in the completion of the contract when there is "a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat." Genesis Energy, L.P., 152 F.4th at 652 (quotation marks omitted). In addition, as the second part of this Court's test for maritime contract

status has developed since the en banc decision in In re Larry Doiron, Inc., this Court has emphasized that "[t]he overarching consideration … is whether it was contemplated that a vessel would be necessary to perform the job." Earnest, 90 F.4th at 813 (quotation marks omitted).

In determining whether a vessel plays a substantial role in completing the contract, this Court has stated that a vessel's function "as a work platform is particularly relevant." In re Crescent Energy Servs., L.L.C., 896 F.3d at 361. However, this Court has also stated that a court's "analysis of 'substantial' ignores the need for vessels to transport equipment and crew to the platform and considers only the other roles the vessels played." In re Crescent Energy Servs., L.L.C., 896 F.3d at 360.

"If a contract does not outline a vessel's use, courts may go on to consider whether the parties expected a vessel to play a substantial role." In re Aries Marine Corp., No. 25-30010, p. 7, ___ F.4th ____, 2026 WL 350683, at *4 (5th Cir. Feb. 9, 2026). This Court has also provided guidance for circumstances when the scope of the contract and the expectations of the parties are both unclear:

> Under this analysis, the contracting parties' expectations are central. This court focuses on the contract and the expectations of the parties. If the scope of a contract and the parties' expectations are unclear, courts may permit the parties to produce evidence of the work actually performed and the extent of vessel involvement in the job.

Genesis Energy, L.P., 152 F.4th at 653 (quotation marks and citations omitted).

By way of summary, this Court has recently stated:

> [T]he Doiron test determines whether maritime law applies of its own force through a contract bearing the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction. The focus of this analysis is on the contract and the parties' expectations, and the role of the vessel should be viewed in light of what is considered classically maritime.

Earnest, 90 F.4th at 812. Finally, "[i]n searching for [the parties'] expectations[,] … we start with examining the contractual obligations." In re Crescent Energy Servs., L.L.C., 896 F.3d at 360. Thus, it first must be determined what the relevant contract is between the parties.

**2. This Court's precedent establishes that both the MSA and the particular work order under which QPS was performing its work at the time of the incident should be considered in determining the nature of the contractual relationship between the parties.**

Because most Master Service Agreements are general in nature and do not discuss the specifics of the work that a contractor is to perform on any one job, this Court—in its en banc decision in In re Larry Doiron, Inc. and in its subsequent decisions—when attempting to ascertain the parties' expectations regarding the substantial use of a vessel to complete the contract, looked not only at the Master Service Agreement between the parties but also to the specific work order that was

being performed at the time of the incident in determining what actually constituted the contract in question.[3]

For example, in In re Larry Doiron, Inc., the parties had entered into a Master Services Contract in 2005 and a worker was injured in 2011 during the performance of a subsequent oral work order. In determining whether there was a maritime contract between the parties for purposes of contractual defense and indemnity, the Court did not just examine the Master Services Contract or the entire universe of work orders that the contractor had performed for the company between 2005 and 2011. Instead, the Court found that the contract in question "consist[ed] of both the blanket MSC and the oral work order, which must be read together." In re Larry Doiron, Inc., 879 F.3d at 573; see In re Larry Doiron, Inc., 879 F.3d at 577 ("Applying this new test to this case, the oral work order called for STS to perform downhole work on a gas well that had access only from a platform.").

Similarly, in In re Crescent Energy Services, L.L.C., this Court recognized that the two contracting parties "already had an ongoing relationship under a Master Service Agreement, which provides general terms applicable to contracts between the parties 'for the performance of work or the provision of services.'" In re Crescent Energy Services, L.L.C., 896 F.3d at 353. Nevertheless, when it came time to

[3] QPS anticipates that Whitney will argue that the Court should consider the time spent by other QPS personnel assigned to Whitney's central facility; however, their work as cooks and mechanics did not give rise to the incident in question.

determine whether the contract between the parties was a maritime contract, this Court looked to both the Master Service Agreement and the specific Turnkey Bid that had been submitted to perform the plugging and abandoning work during which a worker had been injured. See In re Crescent Energy Services, L.L.C., 896 F.3d at 360 ("In searching for expectations here, we start with examining the contractual obligations. The Turnkey bid is the relevant document, as the Master Service Agreement's more general language does not address the details of the P&A work."). According to the Court, "[t]he Turnkey Bid and the Master Service Agreement together formed Carrizo and Crescent's contract." In re Crescent Energy Services, L.L.C., 896 F.3d at 353. Again, this Court did not look solely at the Master Service Agreement or to prior work orders or bids performed by the contractor; instead, the Court looked at both the Master Service Agreement and the specific work order that was being performed at the time of the incident.

Lastly, in Barrios v. Centaur, L.L.C., 942 F.3d 670 (5th Cir. 2019), cert. denied, 509 U.S. 906, 140 S.Ct. 2675, 206 L.Ed.2d 826 (2020), United Bulk Terminals Davant, LLC entered into a Master Service Contract ("MSC") with Centaur, L.L.C. which "governed future project-specific work orders between the parties." Barrios, 942 F.3d at 673. According to this Court:

> **Centaur and UBT executed several work orders for projects at the Davant Facility**. One—for which Centaur submitted a proposal in October 2015—required installation of a concrete containment rail at one of the facility's docks.

* * *

> Centaur's proposal indicated that, at an increased cost, both a barge and a tug boat would be required to complete the project. UBT accepted the proposal and issued a purchase order in November 2015. **<u>That purchase order and the MSC, in tandem, formed the contract at issue</u>** (the "Dock Contract").

<u>Barrios</u>, 942 F.3d at 674 (emphasis added). As can be seen, although Centaur and UBT had executed "several work orders for projects at the Davant Facility," this Court only considered one of the work orders during the performance of which a worker was injured when determining whether or not the contract at issue was a maritime contract.

Considering the foregoing, this Court should respectfully consider not only the MSA but also the specific work order being performed by QPS at the time of the incident in construing the contractual relationship between QPS and Whitney particularly in the absence of a third-party vessel operator as is typically involved in oil and gas contractual relationships. The MSA and work order will both be discussed below.

### A. <u>The MSA contemplates vessel involvement in the performance of QPS' work</u>.

Beginning with the MSA between Whitney and QPS, it is particularly non-descript and general as to what duties QPS contracted to perform. In this respect, the MSA simply states that "[t]he purpose of this Agreement is to set forth the terms and conditions of any Work undertaken by Contractor [QPS] for Company

[Whitney], and to define the contractual rights, obligations, and liabilities of the Parties." ROA.1588. Nevertheless, the MSA provides insight into the parties' expectations regarding whether a vessel would play a substantial role in the completion of the contract.

First, although Articles 1 through 8 of the MSA do not overtly refer to a vessel being used to perform the Work, Article 9 states that "the General Maritime Law of the United States of America shall govern the interpretation of this Agreement and the relationship of the Parties to the exclusion of other law." ROA.1601. In addition, the MSA states that "[t]his Agreement shall be deemed to be a personal contract of Contractor [QPS], which waives all benefits of the Shipowners Limitation of Liability Act, 46 U.S.C. § 183, et seq., as to Company [Whitney]." ROA.1601. This "personal contract" provision, which is associated with the Shipowner's Limitation of Liability Act, would serve no purpose if a vessel was not expected to be used by QPS in performing its Work under the MSA.

Finally, the MSA's Insurance Coverage Requirements (stated in Exhibit B to the MSA) specifically contemplate that a vessel would be used by QPS in performing the Work. In this respect, the MSA states that "[a]ll policies required to be carried by Contractor [QPS] shall have adequate territorial and navigational limits for the location of the Work, including, where appropriate, operations in the Gulf of Mexico." ROA.1605. The MSA's insurance requirements further state that "[i]f

Contractor [QPS] **uses**, or hires, or charters vessels, or employs maritime workers and/or Jones Act Seamen and/or persons who work on or over navigable waters (including Outer Continental Shelf), Contractor [QPS] must obtain (in addition to any other coverage that is required of Contractor [QPS]) all applicable maritime coverage set forth below that is designated by the symbol "*"." ROA.1605; (emphasis added). Thus, the MSA's insurance requirements provide that "[w]here the Work involves the use of Vessels or marine equipment, the Contractor shall provide the following insurance[: protection and indemnity, hull and machinery, and charterer's legal liability]." ROA.1607-1609.

It is also relevant to the parties' expectations that after the execution of the MSA, QPS made an e-mail inquiry to Whitney's Chief Operating Officer, Jonathan Wiens, regarding insurance "coverage for our guys that will be running the boats for crew change." ROA.2006. In response to this e-mail, Jonathan Wiens passed along to its risk manager QPS' inquiry regarding insurance coverage, and therein stated the following:

> Nearly all of the workers at East Bay and GIB are all QPS contracted employees. **The Miss Maggie's boat drivers are QPS employees**. QPS' insurance company posed a few questions below. Please take a look and I'll forward them any info or you can contact QPS directly.

ROA.2005; (emphasis added).

Finally, while this Court in In re Larry Doiron, Inc. rejected the contractor's argument that the insurance provisions of the MSA contemplated the use of a vessel by the contractor, this Court did so because the contractor there did not use a vessel:

> STS [the contractor] argues that the following provision in the MSC contemplates the use of a vessel: "IF CONTRACTOR [STS] *USES* ANY VESSELS IN CONNECTION WITH ITS WORK FOR COMPANY OR COMPANY GROUP," additional vessel-related insurance is required. (emphasis added).
>
> This insurance provision on its face has no application because STS did not provide or use a vessel—the vessel and crew were provided by LDI. This provision requiring vessel-related insurance applied to contractors such as LDI.

In re Larry Doiron, Inc., 879 F.3d at 573 n.23 (emphasis and ALL CAPS in original). In contrast to the circumstance presented in In re Larry Doiron, Inc., here, it is undisputed that QPS (the contractor) actually used a vessel in the performance of its work. Considering the above, it is abundantly clear that the MSA specifically contemplated that a vessel may be used in QPS' performance of the contract and that both parties expected QPS to operate Whitney Oil's vessels.

**B. The verbal orders Whitney provided to QPS' production operators were given with the understanding that a vessel would be required.**

Turning now to the work order in effect at the time of the incident, it has never been a common practice for Whitney to issue a written work order to QPS, and, in fact, Whitney is not aware of any written work orders ever being issued to QPS. ROA.2018:14-25. What Whitney did do, however, was to provide verbal

instructions to QPS' production operators nearly every day and it was understood that a vessel would be required. ROA.2162:12-22. Thus, despite the statement in the MSA that all verbal work orders must be confirmed in writing within 72 hours, this practice was never followed by Whitney in its dealings with QPS. ROA.2113:11-19.

Additionally, the evidence in this case establishes that on the day of the incident, September 27, 2021, following an early morning production meeting at Whitney's central facility between the production operators and the foreman, ROA.1311:15-19; the Person-in-Charge for Whitney, Clayton Holmes, issued verbal orders to the various personnel, ROA.1415:20-25, 1435:12-14. Specifically, Clayton Holmes instructed Wyatt Boone and Kerri Espadron to go out in the field and do a pollution check, ROA.1416:1-7; and they were also instructed to drive out to platform Knockout 3 to have a Job Safety Analysis Sheet signed so that construction work to repair hurricane damage to that platform could begin, ROA.1311:2-1312:11, 1317:2-4, 1349:15-17. In compliance with this order, Wyatt Boone drove Whitney's vessel Lil Red out into the field and Kerri Espadron served as lookout. ROA.1312:12-14. On the way out, the Lil Red allided with a well and Kerri Espadron suffered injuries. ROA.1313:3-9.

This verbal order coincided with the obligations performed by QPS' production operators in the aftermath of Hurricane Ida. In this respect, from the time

of Hurricane Ida's landfall to the day of the incident, the sole job of the production operators was to check for pollution sheens in the water. ROA.1396:3-6, 1414:14-18. This involved checking every platform and well, assessing storm damage, and clearing the platforms and wells of storm debris. ROA.1309:14-19, 1310:3-14. Once this daily offshore assessment was completed, the production operators would assist in cleaning up the central facility. ROA.1349:18-1350:1. Following Hurricane Ida, the production operators would make two separate and independent pollution runs in the Whitney vessel each day—one in the morning, and one in the evening at the end of the day. ROA.1355:16-1356:6. It would take approximately two hours to complete a single run. ROA.1356:7-20. These pollution checks could not be performed without the use of a vessel. ROA.1290:2-17.

### 3. The evidence presented at trial overwhelmingly demonstrates that the second part of this Court's two-part test for maritime contract status in the oil and gas industry was satisfied and that the contractual relationship between QPS and Whitney was maritime in nature.

In Findings of Fact Nos. 14 through 16 and 21 the district court found:

> 14. The Court accepts the testimony of Kyle Domangue, QPS' corporate representative, who testified that when it entered into the MSA with Whitney Oil, QPS expected that the production operators it supplied would be operating vessels and working in an area that could only be accessed by vessel.
>
> 15. QPS procured marine insurance because it anticipated that its production operators would be operating vessels.
>
> 16. The Court accepts the testimony of Kyle Bordelon, Whitney Oil's corporate representative, who testified that the QPS

> production operators utilized vessels to get from one well or platform in the oil field to another. He testified that given the nature of the production operators' duties, Whitney Oil anticipated that QPS personnel would operate its vessels for this purpose.
>
> * * *
>
> 21. QPS production operators often operated Whitney Oil's vessels as part of their job duties.

ROA.1237-1238. Despite these findings, the district court found in Findings of Fact No. 17 that "Whitney Oil and QPS did not have a shared expectation that vessels would play a substantial role in the completion of the work under the MSA other than for transportation to Whitney Oil's central facility and satellite platforms and wells." ROA.1237-1238. The district court then went on to find in Findings of Fact No. 33 that "[t]he responsibilities of the QPS production operators were not traditional maritime work." ROA.1239.

**A. An exception to this Court's general rule that the use of a vessel in transporting workers to and from a jobsite is not considered in the calculus involved in determining maritime contract status is respectfully warranted when, as here, the production operators provided by QPS were actually operating Whitney's vessels in driving to, from, and between offshore jobsites, and were not mere passengers in a vessel being operated by a third party.**

These wholly inconsistent findings by the district court appear to be based on a literal reading of this Court's statement in In re Larry Doiron, Inc., 879 F.3d at 576 n.47, that "[t]he calculus would not include transportation to and from the job site." Thus, it appears that the district court wholly ignored the fact that the QPS

production operators were actually responsible for driving and navigating Whitney's vessels throughout Whitney's field every single day, and thus were not mere passengers on a vessel being transported around by a third party.

Importantly, this Court has recently implied that an exception to this calculus regarding vessel transportation may be warranted in the right circumstance. See Offshore Oil Services, Inc., 150 F.4th at 684 ("As a general rule, the Doiron analysis does not take into account vessels used to merely transport workers from the shore to a platform. See Doiron, 879 F.3d at 576 n.47. And IOC offers no compelling argument warranting an exception to this principle."). Respectfully, an exception to this general rule is warranted here when the contracted worker is actually driving the company's vessel to a specific location—and is not just a passenger along for the ride—and thus the transportation and vessel operation functions are actually part of the worker's duties.

Notably, the situations presented in In re Larry Doiron, Inc. and its progeny where this Court's general rule regarding vessel use for transportation arose did not involve the circumstance presented here where the contracted worker was, for all intents and purposes, the captain of the company's vessel, with all of the particular responsibilities that duty entails, who was expected to, and actually did, operate and navigate the company's vessel on a regular basis, including on the day of the incident. In other words, this case is decidedly not the circumstance where a third-

party company is transporting the offshore workers to and from the jobsite which effectively renders the transportation component in those cases of no moment because the workers are mere passengers on the vessel who are not performing any duties. Moreover, as this Court has recently stated:

> The "focus" of the Doiron analysis is on the contract and the parties' expectations, and the role of the vessel should be viewed in light of what is considered classically maritime. Mere reference to vessels in the contract is insufficient: there must be a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry.

Offshore Oil Services, Inc., 150 F.4th at 683-84 (quotation marks and citations omitted). Here, there can be no question that the operation of a vessel on navigable waters is a classically traditional maritime activity and the proper object of a maritime contract. Finally, as this Court has stated:

> Doiron's requirement that a vessel will play a substantial role in completing the contract, incorporates the traditional view that a contract relating to a ship in its use as such is a maritime contract if there is a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat. In other words, Doiron's test contemplates traditional maritime activities because it ensures that the relation of the contract to the vessel, i.e., the vessel's role, is substantial rather than incidental.

Earnest, 90 F.4th at 813 (quotation marks and citations omitted). Clearly, there is a direct and substantial link between QPS' providing of production operators to Whitney and the operation of Whitney's vessels which makes the role of the vessel

substantial. Under these conditions, an exception to this Court's general rule regarding vessel transportation is respectfully warranted.

### B. There is an abundance of evidence demonstrating the parties' mutual expectations of substantial vessel use and involvement.

In addition to the foregoing, the record is replete with evidence of the parties' mutual expectations of substantial vessel use and involvement. For example, it was considered normal for QPS' personnel, including Wyatt Boone, to operate Whitney's vessels day in and day out in performing their work. ROA.1392:3-20, 1416:16-23. Also, because Whitney anticipated that QPS' personnel such as Wyatt Boone would be operating and driving Whitney's vessels, ROA.2074:6-19; QPS' production operators were required to have completed a boater safety course, ROA.1390:5-15. QPS understood that its obligations under the MSA were to supply personnel and contract operators with the knowledge that those people would be operating vessels. ROA.1475:6-9, 1479:16-1480:5. Whitney also understood that QPS' production operators would be operating Whitney's vessels. ROA.2074:12-19. This mutual understanding that QPS' personnel would be operating Whitney's vessels in the performance of their work was also recognized in an e-mail exchange between Greg Baudoin of QPS and Jonathan Wiens of Whitney after the MSA was executed. ROA.1479:2-8, 2004-2006.

The district court also quoted this Court's recent statement that "[t]he fact that parties operating under a contract for nonmaritime services can require employees

to conduct atypical and incidental vessel-related maritime tasks does not create a maritime contract," In re Offshore Oil Services, Inc., 150 F.4th at 687, as one of its Conclusions of Law. ROA.1245. The implication appears to be that the district court found that QPS' use of a vessel was "atypical" and "incidental." Again, however, the evidence in this case establishes that QPS' operation of Whitney's vessels was anything but atypical or incidental, and instead was critical and necessary on a daily basis for Whitney to be able to operate its oil field. ROA.1418:12-17. In fact, Whitney admits that it is impossible to operate its oil and gas fields without vessels. ROA.2069:4-6.

Moreover, Kerri Espadron, the Whitney employee injured in the allision, testified at trial that the majority of the work that QPS personnel performed was done on or in a vessel:

> Question: Did you and the other QPS personnel do everything you just explained to the Court through the use of a vessel?
>
> **Espadron: Yes.**
>
> Question: Was the majority of the work that QPS personnel, including Wyatt Boone, done on or in a vessel?
>
> **Espadron: Yes.**

ROA.1307:16-21. Kyle Bordelon, who was Whitney's Operations Manager at the time of the incident, testified that Whitney issued verbal work instructions to QPS "nearly every day" and that it was "understood that a vessel would be required."

ROA.2162:12-22. Whitney has admitted that its "position and expectations would be that vessels would be utilized for transportation of personnel to and from several locations throughout the field." ROA.2113:20-25, 2114:1. Whitney, however, also admitted that it has no written documentation of what each production operator does each day with respect to whether that person was working on a vessel or on a platform, and also has no written documentation to support when a vessel may have been used as a work platform. ROA.2030:2-6, 2089:6-13. Thus, there is nothing in the record, other than the ipse dixit speculation of certain Whitney employees, to support the district court's finding that "QPS production operators working in Whitney Oil's oil fields spent between 15 and 20 percent of their time aboard vessels under normal circumstances." ROA.1239.

Considering the evidence produced at trial and set out above, one thing is certain: A vessel was necessary to perform the job duties of the production operators provided by QPS and thus a vessel played a substantial role in QPS' performance of the contract. As discussed above, "whether it was contemplated that a vessel would be necessary to perform the job" is the "overarching consideration" recognized by this Court. Earnest, 90 F.4th at 813. In short, without a vessel being involved, a production operator provided by QPS would simply not have been able to do any of the tasks required on a daily basis to monitor the multitude of satellite wells and

platforms in a production operator's area of responsibility either before Hurricane Ida or after. A vessel's role cannot get any more substantial than that.

Lastly, it should not go without notice that Whitney, in its Limitation Complaint, admitted that it "has been paying and continues to pay maintenance and cure to or on behalf of Kerri Espadron." ROA.17. The ramifications of this are that Whitney apparently recognized early on that Mr. Espadron was a seaman for purposes of the Jones Act since maintenance and cure is a remedy exclusively available only to Jones Act seamen. Consequently, Whitney has effectively admitted that Mr. Espadron, in his role as a production operator, had an employment-related connection to a vessel in navigation, or a fleet of vessels owned by Whitney, that contributes to the mission of the vessel and is substantial in terms of both its duration and nature. In other words, Whitney initially recognized that Mr. Espadron spent approximately 30% of his employment time in the service of a Whitney vessel and thus was not a longshoreman.

At trial, Kerri Espadron testified that a vessel was essential to the completion of his work as a production operator. ROA.1289:24-1290:1. Mr. Espadron, who worked with Wyatt Boone nearly every day for five or six years, ROA.1307:2-8; and who had previously worked for QPS as a production operator before working for Whitney, ROA.1287:3-11; further testified that the majority of the work done by Wyatt Boone and the other QPS production operators was done on or in a vessel,

ROA.1307:9-21. Mr. Espadron also testified that he had ridden in a boat that Wyatt Boone was operating "hundreds of times," ROA.1307:25-1308:2; and that Boone and the other QPS production operators had authority from Whitney to operate Whitney's boats, ROA.1308:6-16. Considering that Mr. Espadron and Wyatt Boone rode together in Whitney's vessels hundreds of times and were both production operators working in Whitney's East Bay Field and performing essentially the same daily tasks, this is further evidence that a vessel played a substantial role in the completion of QPS' work. Cf. In re Larry Doiron, Inc., 879 F.3d at 577 ("It is also conceivable, for example, that the seamen status of a crew … could be relevant to whether the vessel involvement was a substantial part of the overall contract. If the contract provided only for work to be done by permanent crewmembers aboard a vessel, the substantial vessel involvement issue would ordinarily be answered."). Consequently, any argument by Whitney that QPS' production operators spent less than 30% of their time aboard vessels in the performance of their duties should respectfully be rejected.

Based on the foregoing reasons, it is respectfully submitted that the second part of this Court's test for maritime contract status in the oil and gas industry is satisfied in this case. Accordingly, the district court's determination that the contractual relationship between QPS and Whitney was non-maritime in nature and therefore governed by Louisiana law was in error and must respectfully be reversed.

**4. The district court erred in granting Whitney's post-trial contractual claim to recover its attorney fees from QPS because the claim is prohibited by the Louisiana Oilfield Anti-Indemnity Act considering that Whitney's pre-trial settlement with Mr. Espadron precluded a judicial determination as to whether Whitney bore any fault for Mr. Espadron's injuries.**

Following the bench trial in this matter, Whitney, as the prevailing party, moved the district court to recover its attorney's fees and costs under Paragraph 9.4 of the Master Services Agreement between Whitney and QPS which states:

> ***9.4 Attorneys' Fees.*** If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing Party shall be entitled to its reasonable attorneys' fees, court costs, and costs of litigation, in addition to any other remedy to which that Party may be entitled.

ROA.1601. If this Court reverses the district court and finds that the contractual relationship between Whitney and QPS is governed by federal maritime law, then this issue becomes moot because Whitney would no longer be the prevailing party. If, however, this Court affirms the district court's determination that the contractual relationship between Whitney and QPS is non-maritime in nature and governed by Louisiana law, then the foregoing contractual provision that Whitney relies upon to recover its attorney's fees would be void as a matter of law under the Louisiana Oilfield Indemnity Act, La. R.S. 9:2780. The contractual provision would be void because Whitney's pre-trial settlement of Mr. Espadron's personal injury claims foreclosed a judicial determination that Whitney was free from fault. See Tanksley v. Gulf Oil Corp., 848 F.2d 515, 517–18 (5th Cir. 1988).

In this respect, the Louisiana Supreme Court, in answering a certified question from this Court, held that "[t]he Louisiana Oilfield Indemnity Act of 1981, La. R.S. 9:2780[,] nullifies completely any provision in any agreement that requires indemnification where there is any negligence or fault on the part of the indemnitee." Meloy v. Conoco, Inc., 817 F.2d 275, 280 (5th Cir. 1987) (adopting the Louisiana Supreme Court's answer to its certified question that was reported at 504 So.2d 833, 839 (La. 1987)). In furtherance of this holding, the Louisiana Supreme Court has stated that:

> The Act only prohibits indemnity for cost of defense where there is "negligence or fault (strict liability) on the part of the indemnitee." The Act does not apply where the indemnitee is not negligent or at fault. An agreement providing for cost of defense in the event of a meritless suit against the indemnitee is outside the scope of the Act. Accordingly, the indemnitor's obligation for cost of defense cannot be determined until there has been a judicial finding that the indemnitee is liable or that the charges against it were baseless. Whether an oil company (indemnitee) is free from fault and thus outside the scope of the Act can only be determined after trial on the merits. [FN 11] If it is established at trial that there is no "negligence or fault (strict liability) on the part of the indemnitee," the Act does not prohibit indemnification for cost of defense.
>
> > [FN 11] Prior to a judicial determination, it is not known whether the indemnitee is or is not at fault; therefore, the Act would prohibit a provision requiring an "up-front" defense.

Meloy, 817 F.2d at 280 & n.11, 504 So.2d at 839 & n.11.

In Tanksley, this Court applied the foregoing principles espoused in Meloy and found that the indemnitee's [Chevron's] pre-trial settlement with the personal

injury claimant was an affirmative choice by the indemnitee [Chevron] to forego a trial on the merits with respect to its potential liability to the personal injury claimant [Tanksley] and this relieved the indemnitor [SEE] of any responsibility for contractual indemnification as a matter of law. As this Court explained:

> In the case at bar, a trial on the merits to determine Chevron's fault or negligence was not only legally possible, it was imminent and was foreclosed only by the compromise settlement with Tanksley. The parties undoubtedly reached this settlement after a careful weighing of all relevant factors and risks. For reasons it deemed sufficient, Chevron opted to forego a trial at which it would either have been found liable or exonerated. The appeal of the certainty of settlement overrode the contending appeal of the uncertainty of trial. As a consequence, because of Chevron's choice, there will be no trial on the merits of Tanksley's claims to determine whether Chevron was "free from fault and thus outside the scope of the Act." Absent such a finding, or a legal bar preventing the finding, as in *Melancon [v. Amoco Production Co., 834 F.2d 1238 (5th Cir. 1988), amended in part on reh'g, 841 F.2d 572 (5th Cir. 1988)],* we must conclude that the Oilfield Indemnity Act nullifies, in this instance, the indemnity agreement between Chevron and SEE.
>
> We are mindful that this resolution is in tension with the established precept that "public policy favors voluntary settlements which obviate the need for expensive and time-consuming litigation." *Bass v. Phoenix Seadrill/78 Ltd.,* 749 F.2d 1154, 1164 (5th Cir.1985); *Miller v. Republic National Life Ins. Co.,* 559 F.2d 426, 428 (5th Cir.1977), [*reh'g denied*, 564 F.2d 97 (5th Cir. 1977)]. But we are not persuaded that this tension is likely to become an undue settlement disincentive. Regardless, we are convinced that the Louisiana statute, as interpreted by the Louisiana Supreme Court, mandates this result. Viewed in perspective, the result is not one which litigants cannot accommodate. In the future, in this type legal situation, the impact of settlement on an existing indemnity agreement need only be factored into the determination of a fair and reasonable settlement. We harbor little doubt that it will be.

Tanksley, 848 F.2d at 517–18.

Returning to our case, here, facing a personal injury claim from one of its employees—Mr. Espadron—Whitney invoked the district court's exclusive admiralty or maritime jurisdiction, filed an action for exoneration from or limitation of liability, and forced all potential claimants to file their claims against Whitney in the Limitation Action or else be defaulted. Thus, QPS was required to file its claim for contractual defense and indemnity against Whitney in the Limitation Action under pain of being defaulted. It should be noted that Whitney could have filed a counterclaim against QPS to recover its attorney fees under the Master Services Agreement between QPS and Whitney in the event that QPS was not successful on its claim but did not do so. See British Transport Commission v. United States, 354 U.S. 129, 138–43, 77 S.Ct. 1103, 1107-10, 1 L.Ed.2d 1234 (1957). Nevertheless, considering that a finding by this Court or the U.S. Supreme Court on appeal that Louisiana law applies in this matter would preclude QPS from seeking contractual defense and indemnity from Whitney, the same result should follow with respect to Whitney's claim for attorney's fees against QPS. This is because the contractual provision upon which Whitney relies is, for all intents and purposes, one for contractual indemnity arising out of a personal injury claim for which there has been no judicial determination—due to Whitney's choice to settle the personal injury claim against it—that Whitney is free from fault.

The fact that Whitney claims that it is only seeking its attorney's fees for defending against QPS's claim for contractual defense and indemnity, and not the personal injury claim of Mr. Espadron, is of no moment because Whitney's limitation action in which QPS was forced to file its claim clearly arose out of Mr. Espadron's personal injuries as did QPS' claim for contractual defense and indemnity. Under this Court's decision in Tanksley, to allow Whitney to recover its attorney's fees when Whitney's settlement of the case precluded a judicial determination as to its fault for Mr. Espadron's injuries, would violate the Louisiana Oilfield Anti-Indemnity Act.

On the other hand, if this Court or the U.S. Supreme Court finds that the contractual relationship between QPS and Whitney is one that is maritime in nature such that general maritime law applies, then Whitney's contractual claim against QPS for attorney's fees would be moot because Whitney would not be the prevailing party. In either case, whether the district court's decision regarding the nature of the contractual relationship between QPS and Whitney is ultimately affirmed on appeal or reversed on appeal, Whitney's claim necessarily fails as a matter of law and was improvidently granted by the district court. The district court's decision on Whitney's post-trial motion should respectfully be reversed.

## Conclusion

Based on the foregoing reasons, the district court's decision finding that the contractual relationship between QPS and Whitney was non-maritime in nature and governed by Louisiana law, dismissing QPS' claims against Whitney for contractual defense and indemnity, and granting Whitney's post-trial motion to recover its attorney's fees and costs from QPS were rendered in error and should respectfully be reversed. Finally, this case should respectfully be remanded to the district court for a determination of QPS' defense costs, attorney's fees, and other sums that Whitney owes QPS under Whitney's defense, indemnity, and insurance coverage obligations towards QPS under the Master Services Agreement between the parties.

Respectfully submitted,

DAIGLE, FISSE & KESSENICH, PLC

BY: /s/ Kirk N. Aurandt
MICHAEL W. McMAHON (La. Bar. No. 23987)
KIRK N. AURANDT (La. Bar No. 25336)
P.O. Box 5350
Covington, Louisiana 70434-5350
Telephone: (985) 871-0800
Facsimile: (985) 871-0899
Attorneys for Third Party Defendant-Appellant, Quality Process Services, L.L.C.

**Certificate of Service**

I hereby certify that a copy of the foregoing Original Brief for Third Party Defendant-Appellant, Quality Process Services, L.L.C., Inc., was served on all parties through their designated counsel of record, as listed below, via the Court's electronic filing system, and via electronic mail to the e-mail addresses below, this 20th day of February, 2026:

Robert R. Johnston, Esq.
Courtney E. Crowell, Esq.
Constance C. Waguespack, Esq.
PUSATERI, JOHNSTON, GUILLOT & GREENBAUM
1100 Poydras Street, Suite 2250
New Orleans, LA 70163
e-mail: Robert.Johnston@pjgglaw.com
Courtney.Crowell@pjgglaw.com
Constance.Waguespack@pjgglaw.com

And

Thomas M. Flanagan, Esq.
Anders F. Holmgren, Esq.
FLANAGAN PARTNERS LLP
201 St. Charles Ave., Suite 3300
New Orleans, LA 7-170
e-mail: tflanagan@flanaganpartners.com
aholmgren@flanaganpartners.com

Attorneys for Plaintiff-Appellee, Whitney Oil & Gas, LLC

/s/ Kirk N. Aurandt
MICHAEL W. McMAHON
KIRK N. AURANDT

**Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements**

1. This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B)(i) because it contains 12,340 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(f) and 5th Cir. R. 32.2.

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and 5th Cir. R. 32.1, and the type-style requirements of Fed.R.App. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman.

/s/ Kirk N. Aurandt
MICHAEL W. McMAHON
KIRK N. AURANDT
Attorneys for Third Party Defendant–Appellant, Quality Process Services, L.L.C.
Dated: February 20, 2026